IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

MICHAEL W. LUBBS,

        Plaintiff,

        v.                        Civil Action No. 2:07-CV-59

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I.  Introduction

A.    Background

      Plaintiff, Michael W. Lubbs, (Claimant), filed his Complaint on July 31, 2007, seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on October

9, 2007.[2]  Claimant filed his Motion for Summary Judgment on December 5, 2007.[3]

Commissioner filed his Motion for Summary Judgment on January 4, 2008.[4]

B.    The Pleadings

    1.    Plaintiff's Brief in Support of Plaintiff's Motion for Summary Judgment.

    2.    Defendant's Brief in Support of His Motion for Summary Judgment.

---

[1] Docket No. 1.

[2] Docket No. 5.

[3] Docket No. 10.

[4] Docket No. 12.

C.    Recommendation

I recommend that:

1.    Claimant's Motion for Summary Judgment be **DENIED** because the ALJ complied with the two-step process set forth in Craig for evaluating the credibility of Claimant's allegations of pain, and because substantial evidence supports the ALJ's conclusion Claimant's allegations of pain were not entirely credible.

2.    Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

## II.  Facts

A.    Procedural History

Claimant filed an application for Disability Insurance Benefits on September 4, 2004 and for Supplemental Security Income on August 16, 2004, alleging disability since December 19, 2000 due to pain in his back and legs.  (Tr. 81).  The application was initially denied on January 14, 2005 and on reconsideration on May 18, 2005.  Claimant requested a hearing before an ALJ and received a hearing on March 9, 2006.  On July 27, 2006, the ALJ issued a decision adverse to Claimant.  Claimant requested review by the Appeals Council but was denied.  Claimant filed this action, which proceeded as set forth above.

B.    Personal History

Claimant was 46 years old on the date of the March 9, 2006 hearing before the ALJ. Claimant completed high school and has prior work experience as an HVAC[5] mechanical technician.  (Tr. 56)

---

[5] HCAC is an acronym for Heating Ventilation Air Conditioning.

C.     Medical History

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability: December 19, 2000 through July 27, 2006:

**Dr. John Meyer, M.D., MPH, 11/2/01, (Tr. 110)**
Impression: Herniated nucleus pulposus L5-S1 level, status post microdiskectomy of L5-S1 disk
protrusion.  Evidence of persistent radiculopathy, with partial relief following surgery.

Recommendations: . . . More importantly, Mr.Lubbs will require vocational rehabilitation with
consideration of his ability to continue to perform the job of an HVAC installer.  He may be able
to return to many duties of this job, but still experiences some loss of strength, which might
prove a hazard to him if he were working at heights, or would need to keep sure footing.  In
addition, it is likely because of his strength decrease, that he is unable to lift as much as could be
expected of a healthy person at his age, and his persistent weakness may make it unable for him
to perform any of the heavy lifting tasks of his previous job.  Therefore, followup with
vocational rehabilitation for him to obtain work in a similar line, that requires less physical
exertion (particularly lifting) is recommended.

**Phil Cooks, M.S., PT, 11/21/01, (Tr. 117)**
A Functional Capacity Evaluation was performed on Mr. Lubbs on November 12 in our facility.
It can be seen that he performed at the Medium PDC level from floor to knuckle and knuckle to
shoulder as noted on page four and five of the report.
Although he performed at the Medium PDC level he did so at the lower level of this
classification and with reports of low back pain.  Based on his performance it would appear that
he is capable of performing light level activity however it is the desire to increase him to
medium level capabilities.  A work conditioning/hardening program should be considered.

**Bridget Zachary, M.S., Preferred Rehabilitation Options and Services, 1/31/02 (Tr. 127)**
Dear Mr. Lubbs: As you are aware, Preferred Rehabilitation has been working with you in
relation to vocational services.  You were released to work full duty with no restrictions by your
treating physician Dr. Kritzer on 1-21-02.  It has been indicated that having a valid driver's
license is an essential job function and your license is currently revoked.  Therefore you are
unable to return to your pre-injury employer due to your non-work related issue.

**Fairmont General Hospital, 1/17/04, (Tr.129)**
Diagnostic Impression: Spiral fracture, right tibia, fracture right fibula.

**Fairmont General Hospital, 1/17/04, (Tr. 133)**
Impression: Fracture of both bones of the right leg as described without dislocation.

**West Virginia University Hospitals, 1/17/04, (Tr. 134)**

<u>Discharge Diagnosis</u>: Right tibia-fibula fracture status post intramedullary nail.

**Dr. Franyutti, M.D., DDS Physician, 1/11/05, (Tr. 173)**
<u>Physical RFC Assessment</u>
Exertional Limitations:
       Occasionally lift and/or carry - 20 pounds
       Frequently lift and/or carry - 10 pounds
       Stand and/or walk  - about 6 hours in an 8-hour workday.
       Sit - about 6 hours in an 8 hour workday
       Push and/or pull - unlimited, other than as shown for lift and/or carry
Postural Limitations:
       Climbing: occasionally
       Balancing: occasionally
       Stopping: occasionally
       Kneeling: occasionally
       Crouching: occasionally
       Crawling: occasionally
Manipulative Limitations: none established
Visual Limitations: none established
Communicative Limitations: none established
Environmental Limitations: unlimited
Symptoms: The symptoms are attributable to a medically determinable impairment.
Comments: Patient is credible, allegations supported by findings.  Patient with status-post fracture of tibia, ___, status-post ____, ___ with residuals, all considered in RFC reduced to light.

**Roger Kritzer, DC, 8/11/04, (Tr. 191)**
...He continues to have recurring left sciatic problems also aggravated by the fall. At this time, he remains temporarily totally disabled pending the resulted of an updated MRI.  He is not employed in his current physical condition.

**Roger Kritzer, DC, 12/19/06, (Tr. 239)**
<u>Clinical Diagnosis</u>: Lumbar sprain/strain; Lumbar disk displacement without myclopathy.
<u>Recommendations, Opinions</u>: Instruct patient not to work till further notice.

**Fairmont General Hospital, 2/12/01, (Tr. 241)**
<u>Impression</u>: Left paracentral disc protrusion at L5-S1. No other abnormalities are seen.

**Fairmont General Hospital, 3/10/04, (Tr. 243)**
<u>Impression</u>:
-Post-op changes at the L5-S1 level with some minimal enhancing scar around the thecal sac. However, there is no significant impingement upon the sac secondary to scar.
-There is a focal disc protrusion at the L5-S1 level on the left side, but it is significantly smaller than was seen on previous exam.  This is noted to efface the anterior epidural fat, but not

significantly impinge upon the neural elements. However, there is some asymmetric enlargement of the left S1 nerve root suggesting some swelling of this root.
-There is noted to be decreased signal in the L5-S1 disc and slight narrowing of the L5-S1 disc space consistent with degenerative disc disease changes.

**Fairmont General Hospital, Dept. Of Radiology, 3/10/05, (Tr. 244)**
Impression:
1) [MRI] negative for significant HNP or spinal stenosis.
2) Degenerated disc disease L5-S1.

**Dr. Bailes, M.D., 4/18/05, (Tr. 245)**
His neurological examination today is nonfocal. He has tenderness in his low back, diminished range of motion, but no erythema or swelling.
In summary, Mr. Lubbs continues to have pain, despite chiropractic and conservative management. While his MRI scan is abnormal, I do not believe that there is any further surgery I would recommend. I did suggest that a referral to the WVU pain clinic may be beneficial and if we can get Workers' Compensation to approve that, I believe that would be the next step and certainly for him to continue with your chiropractic management. At the present time, he states his pain is of such significance that he is unable to work. Please contact me if you wish to discuss this further.

**Dr. Eddie Powell, M.D., WVU Dept. Of Orthopedics, 6/1/04, (Tr. 253)**
Assessment: 1) Right leg pain; 2) Subtalar arthrosis.

**Dr. Davenport, West Virginia Dept. Of Health and Human Services, 10/14/05, (Tr. 285)**
Is applicant able to work full time at customary occupation or like work? No. Difficulty lifting, sitting, carrying items.
Is applicant able to perform other full time work? No
What work situations, if any, should be avoided? Lifting
Duration of inability to work full time: One year

**Dr. Davenport, 3/7/06, (Tr. 290)**
Attending Physician's Statement of Disability
Diagnosis: Herniated disk
Progress: Retrogressed
Extent of Disability:
      Is patient now totally disabled? Yes, for any occupation and patient's regular occupation.
      Patient is applying for disability currently and they will make determination.


D.     Testimonial Evidence

      Testimony was taken at the March 9, 2006 hearing. The following portions of the

testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ALJ]  (Tr. 347)

Q        - - about your daily activities.  Give me a typical day at the present time?  What time do you get up, what you're do in the - -

A        I'm a pretty - -

Q        - - morning, what you do in the afternoon, what you do in the evening.

A        I'm a pretty early riser.  And then, of course, I get up - - I have to get up several times during the night to relieve my bladder because I've got a - - I, I can't control my bladder.  I don't know how you'd want to word it.  I get a sensation that I have to urinate and if I don't have a bathroom real close, it's going to go down my leg.  So, I don't even - - rarely even go to a grocery store.  But, yeah - - so, when I get up in the morning, I push the button and let the coffee brew, turn on the news and let the dog out, let him back in and virtually not too much.  I do do some dishes, but I don't do them very fast because standing slightly bent over, even over a dish pan, my back just starts to ache.  It just shoots right across both sides.  And then, you know, and it's painful so - - you know, and I get, I kind of restless and I - - like, right now, it's - - my back is killing me so, I'm going to get up and stretch.  But, yes, that's pretty much how the morning is.  Lunchtime, I'll make a sandwich or, you know, a frozen burrito or something like that.  My wife and I - - we're, we're, we're to the point where it's just easier for us to buy, like, pre - - you know, frozen meals.  So, we just have to pop them in the oven.  So, we don't do a lot of home cooking anymore.  And then when we do it it's usually a team effort.

*                    *                    *

Q        With respect to your activities - - your daily activities - - at the, at the present time

do you, you normally take care of the house during the day and - -

A      I don't vacuum it, but I do the dishes and keep the kitchen tidied up because that's pretty much - - I'm a kitchen person anyway.  I have a T.V. in there and then I can get up and down at will.  I - - like I say - - I do the dishes, but my wife knows - - and it even bothers her the same way, but she'll - - she tolerates it, but it gets me right in the lower back just to push a vacuum cleaner around.

Q      So, let's say - - do you take a - - you get up - - what time do you normally get up?

A      Usually anywhere between - - well, I'm always up at about four in the morning, but then I go back to bed and I usually get up between 6:30 and 7 o'clock because the neighbors upstairs are real good alarm clocks.  He goes to work at quarter, quarter to seven so, I'm awake.

Q      So, when you fix your coffee or something like that then - -

A      Yeah, well, I usually take care of that the night before and then all I have to do is push a button then in the morning.

Q      Do you, do you let the dog out or does the dog stay out?

A      No, I let him out.

Q      Do you fix breakfast?

A      Not particularly, no, but it's - - I'm not a big breakfast person anyway.

Q      So - -

A      My wife will get up and have cereal.

Q      - - what do you do then after you've had your coffee in the morning, typically?

A      Not too much, really.

Q      Do you watch television or read?

A        I watch television, but we only get two channels.  So, I watch - - I'll watch the

Today Show in the morning and then I'll watch Pat Robertson with the 700 Club and then Andy

Griffith and then - - Andy Griffith or the Price is Right.  Then the news and by then usually I'm

ready - - I go back and lay down for a while and listen to the soap operas.

Q        So, why do you have to go back and lay down?

A        Because by then, my back is so fatigued out.

Q        Do you do any other things around the house besides take care of the dishes and -

-

A        I throw a load of laundry in once in a while.

Q        Do you hang the clothes up outside, like, on the clothes line?

A        When, when the weather is nice we have a clothes line on the front porch because

the main clothes line is out in the yard or the neighbor's upstairs and so, we, we made a clothes

line for the front.  And if it's too lousy a weather, they get hung up in the bathroom or on curtain

rods by - - near windows and - -

Q        You said you mow part of the yard.  Do you have a power mower?

A        Yeah, it's - - matter of fact it was my wife's friend from school that gave us a

mower that she thought was broken that all it had a broken pick up tube in the gas tank.  And so,

I popped that apart - - we brought it in the house, put it up on the table or, you know, table high

and then I could work on it.  And it just had a broken pick up tube in the tank and it's a real

lightweight mower.  It's one of those little tiny red ones, you know?

Q        Uh-huh.

A        With a gas engine.  And that's the one I like to push because it's easier for me to

push plus it's really light. But we do, we do the yard in very short bursts. We'll do the back on one day. Then we do the front on the other day.

Q    How long does it take you to do that?

A    By myself, the back yard usually runs me - - because I stop a lot - - I'd say I usually can get it - - the back mowed in about an hour.

Q    And do you bag the grass or do you just clip it?

A    We, we just clip it and sometimes, if it's heavy enough, we rake it and bag it up and get rid of it.

Q    Do you do other things outside the house? I mean, from a standpoint of maintaining the house?

A    Well, I walk around the yard and pick up sticks and stuff because we live in a - - it's, it's real wooded area. Our house is in the clear, actually, but it's - - right off the house about 25 feet away, 20 feet away is where the woods starts. So, we've got limbs and stuff. Small branches and twigs that are always in the yard and I go out and I'll pick them up and - -

Q    Do you have air conditioning?

A    We have a small window unit that we only air condition the bedroom.

Q    Do you, do you have your own heating?

A    We have electric baseboard heat.

Q    The - - do you do any work on your vehicle?

A    Yeah, when it, like - - I do change the oil on it and, you know, but I haven't had to do anything major to the truck other than just change the oil really. If it needs to have the tires rotated or anything like that, I - - we - -my wife will take it down to a friend of ours and he'll

rotate them.

Q       Do you do other activities outside the home?

A       No.

Q       Do you go hunting or fishing?

A       No, but I buy a license and I do - - I did walk up the hill just - - or not up the hill, but down - - we have a, a right of way that runs through there for the coal mine trucks when they go to take their ground samples.  So, they made kind of a road back in there and I'll walk back in there, but I, I, I don't - - I don't spend enough time out there.  I never got - - even got a deer or anything.  And fishing I don't do anymore, either.

Q       How much - - how far can you walk on level ground without having to stop and rest?

A       On level ground - - if - - like, you mean on pavement?

Q       Well, just level ground.

A       Level ground, probably, maybe - - without starting to fatigue, I'd say around 100 yards.

Q       What bothers you after walking 100 yards?

A       My lower back.

Q       When you say you're lower back, you're talking about your waist level or - -

A       Yeah, belt, belt line and right above.  Well, just below belt line and above it or with this - - about that side.

Q       Can you walk for a half hour at a time?

A       I haven't tried it.  It - -

Q	Do you go - -

A	My back is hurting before then.

Q	Do you go out and walk around the yard or - -

A	I walk down - -

Q	- - walk during the day?

A	- - to get the mail, but - - like I say, I walk down to get the mail, but our driveway is probably 65, 75 yards - - 65 yards long.  So, by the time I walk down the hill to the mailbox and then walk back up the hill, my lower back is kicking in hard.

Q	How about just standing if you're doing food preparation or cooking or working at the counter?  Can you stand for a half hour at a time without having to sit down or move around?

A	I - - I - - rarely.  I, I don't recall lately even having to do that.

Q	Do you have any problems sitting?

A	Yeah.

Q	How long can you sit for without having to get up or move around?

A	I need to get up and move around now.

Q	So, you can sit for - -

A	15 - -

Q	- - half hour to - -

A	- - 15, 20 minutes and then I'll be moving around.  Like I say, I'm a kitchen person so, I'm at - - I got my chair right there plus I get up and I can still watch the T.V. and I'll -

                    \*            \*            \*

Q      Now, you have, you have problem with respect to overusing your pain medicine?

A      No.

Q      You've been taking hydrocodone for how long?

A      Just a couple days.

Q      Were you taking anything for pain besides that?

A      No, I was using - - I was taking Advils and he put me on a drug called

Amitriptyline at first and - -

                    \*            \*            \*

[EXAMINATION OF CLAIMANT BY ATTORNEY]  (Tr. 364)

Q      There is mention in the records where doctors have talked about the use of pain medication.  You're now on hydrocodone?

A      That's correct.

Q      How much of it are you actually using?

A      I've only used four or five out of the - - since - - I only got them on Saturday and I fell on Saturday.  I took one then.  I took one on Monday when I fell - - after I fell.  And I took one last night.  So yeah, I've, I've only taken three of them out of 30.

Q      Okay.  You say you fall a lot.  How much is a lot?

A      It's getting more frequent now.  My left leg gave out on me at - - right in the door of my house.  That was Saturday.  Because I got that, that little threshold piece and it hooked my left toe and down I went.

Q      What does a lot mean?  More like once a day, once a week, once a month?

A        It's getting more frequent, but it's, it's - - it has never exceeded more than once a day.

Q        You talked about laying down during the day.  How frequently do you lay down?

A        Well, I usually lay down around 1:00, 1:00, 1:30 and I'll lay there and listen to the soaps for an hour or two and if it goes, it goes off and - - but then I'm back up by 4:00 because my old trusty companion dog is like an alarm clock.  He knows when it's dinner time and he'll come get me.

Q        Why do lay down at 1:00?

A        Fatigue.

Q        Now, is your condition a painful condition?

A        Yes.

Q        Where is the pain located?

A         My lower back, my left leg feels like it's on fire - - burning all the time and now I'm having really sharp, shooting pains down my right leg.

Q        How severe is this pain?

A        When that shooting pain goes down the right leg - - let's say that I twist and I do it just - - it, it hits me just right - - I would say a number ten.

Q        That's ten out of ten?

A        That's ten - - if you're scale is one to ten, it's a ten.  It's enough to bring tears to your eyes.

Q        Are there times when you're pain free?

A        Not really.  It's - - I've always got a continuous ache.

Q     And what's the number of pain that's continuous?

A     Well, with this new medication he put me on, I'd say it knocked to down to about a four on a scale of one to ten, but before that, it was probably - - run about a five or a six for a continuous fatiguing pain in my back.

Q     How frequently do you get the increased pain?

A     Oh, boy.  It depends on, you know, how I move or how I - - or how I get up or down from sitting to standing.

Q     Well, what does it average in an average week?

A     Well, most mornings I have to - - I kind of roll out of bed and I get, get down to my knee and then pull myself up because it's - - after being elongated and stretched out, I - - it kind of kinks or something when I, when I move to get up.


Q     When you get an episode of the increased pain, how long does it last?

A     Well, the sharp, stabbing pain - - it'll, it'll, it'll shoot real hard for maybe a minute or two and then it'll kind of ease off just a little bit, but the, the first one is enough to double you up.

Q     Well, how long are you concentrating only on the pain when you have these episodes of increased pain?  More like a minute?

A     For the duration.

Q     More like five minutes?

A     No, for the duration.  If it, if it doesn't ease up, I'm thinking - - you know, I concentrate on it all the time.

Q    Generally, what's the duration?

A    Anywhere between - - I'd say five to 25, 25 minutes.

*          *          *

E.    Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

•    Watches television and listens to the radio on a daily basis.  (Tr. 88)

•    Does light housework, such as doing some dishes and "straightening up."  (Tr. 88)

•    Takes care of his dog.  (Tr. 89)

•    Able to tend to personal needs and grooming.[6]  (Tr. 90)

•    Prepares sandwiches, soup, and simple meals three times per week.  (Tr. 90)

•    Goes outside daily.  (Tr. 91)

•    Able to pay bills/count change/handle a savings account/use a checkbook/money order. (Tr. 91)

•    Spends time in house with other family members, including his wife, her son, and the son's family.

•    Can walk 1/4 mile on flat surface.  (Tr. 93)

•    Uses a walking stick when walking to the mailbox.  (Tr. 94)

---

[6] In his original Function Report dated October 2004, Claimant represented he had trouble dressing, but could otherwise care for his personal needs and hygiene. (Tr. 89).  In his Reconsideration Disability Report filed February 2005, Claimant stated he had difficulty bathing, dressing, and tying his shoes.  (Tr. 106).

- Does laundry once in a while, including hanging clothes to dry.  (Tr. 354)

- Mows the lawn with a push mower, for up to an hour.  (Tr. 354)

- Cleans up sticks from the yard.  (Tr. 355)

- Attends church six to eight times per year.  (Tr. 363)

### III.  The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant contends the ALJ erred in discrediting his allegations of persistent pain and associated limitations.  Commissioner contends the ALJ did not err as alleged because the ALJ complied with the two-step process set forth in <u>Craig</u> and his findings were supported by substantial evidence.

B.    <u>The Standards</u>.

1.    <u>Summary Judgment</u>.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  <u>Matsushita Elec.  Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial."  <u>Anderson v.  Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

2.      Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.      Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that he has a medically determinable impairment that is so severe that it prevents him from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.      Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that he was disabled before the expiration of his insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.      Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.      Social Security - Scope of Review - Weight Given to Relevant Evidence.  The

Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.     Social Security - Substantial Evidence - Defined. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.     Social Security - Sequential Analysis. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether he has a severe impairment, 3) whether his impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform his past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, he will automatically be found disabled if he suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform his past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.    <u>Discussion</u>

    1.    <u>Whether the ALJ Erroneously Assessed the Credibility of Claimant's Statements of Pain</u>.

Claimant contends the ALJ erred in concluding his allegations of pain - persistent pain in his lower back and left leg and a sharp pain in his right leg - are not entirely credible. Specifically, Claimant argues the ALJ conducted an inadequate "pain analysis" because he improperly evaluated the medical opinions of Drs. Davenport, Franyutti and Meyers, and overlooked the fact Claimant is prescribed significant medication for his pain and has to lay down during the day due to this pain.

Commissioner contends the ALJ properly concluded Claimant's complaints of disabling pain and accompanying limitations were not entirely credible.

The Fourth Circuit, in <u>Craig</u>, 76 F.3d at 585, set forth the standard for evaluating the impact of a claimant's subjective symptoms, including pain, on their ability to work.  Under <u>Craig</u>, when a claimant alleges disability from subjective symptoms such as pain, he must first show the existence of a medically determinable impairment that could cause the symptoms alleged.  <u>Id.</u> at 594.  The ALJ must "expressly consider" whether a claimant has such an impairment.  <u>Id.</u> at 596.  If the claimant makes this showing, the ALJ must next determine the extent to which the subjective symptoms impair the claimant's ability to work.  <u>Id.</u> at 595.  In such a determination,

> "Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or the severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

Id. at 595.  In other words, the ALJ need not credit the Claimant's allegations of pain and limitations to the extent they are inconsistent with the available evidence.  Id.  As long as the ALJ follows the legal mandates of Craig, his factual determinations will be upheld so long as they are supported by substantial evidence.  Milburn Colliery Co., 138 F.3d at 528.

The Court first finds the ALJ complied with the two-step process set forth in Craig.  In compliance with the first step of Craig, the ALJ considered whether Claimant had impairments that could cause the pain alleged and concluded,"Claimant does have medically determinable impairments that could reasonably cause some leg and back pain from time to time.  (Tr. 19).  In compliance with the second step of Craig, the ALJ considered the degree to which the pain from Claimant's impairments impacted his work-related abilities and concluded Claimant experienced pain, "but not to the nature, frequency, and severity alleged."  (Tr. 20).  In so concluding, the ALJ relied on evidence Claimant retained the ability to mow the lawn, care for his personal grooming and hygiene, perform light household chores, and walk a quarter of a mile.  (Tr. 20).  The ALJ also relied on reports from treating neurologists and a radiograph reports that established an absence of focal neurological deficits, stenosis, or disc herniation.  (Tr. 20).  Finally, the ALJ relied on the fact Claimant returned to work for six weeks during the relevant period.  (Tr. 20).

The Court next finds substantial evidence supports the ALJ's conclusions throughout the Craig analysis.  First, as noted by the ALJ, Claimant's lifestyle evidence contradicts the degree of pain alleged.  See Craig, 77 F.3d at 595 [holding "evidence of the claimant's daily activities" should be considered].  Specifically, and in addition to the activities cited by the ALJ, the record establishes Claimant retains the ability to mow the lawn, pick up sticks in the yard, and do light

housework and laundry.  (Tr.  88, 354, 355).  Additionally, Claimant, in January 2004, retained

the ability to climb a ladder to put in "cross member studs . . . for a false ceiling . . . actually

lowering a ceiling."  (Tr. 344).  He also retained the ability to do home construction.  (Tr. 321).

In its entirety, Claimant's lifestyle evidence suggests Claimant's pain is not as disabling as

alleged.  Claimant's allegation the ALJ improperly disregarded his need to lay down is without

merit because substantial evidence, namely Claimant's testimony his need to lay down results

from "his back being fatigued out," and "fatigue," as opposed to pain, supports the ALJ's

decision to overlook Claimant's need to lay down.  (Tr. 353, 365).

    <u>Second</u>, substantial evidence supports the ALJ's conclusion the medical evidence did not

support the degree of pain alleged by Claimant.  Dr. Meyer, for example, examined Claimant in

November 2001 and concluded Claimant was able to perform many of his former job duties, but,

due to some loss of strength, should find work that requires less physical exertion.  (Tr. 110).

Phil Cooks, a physical therapist, also examined Claimant in November 2001 and concluded he

was capable of performing light work.  (Tr. 117).  Similarly, Dr. Franyutti, a state agency

physician, reviewed the record in January 2005 and concluded Claimant retained the RFC to

perform light work.  (Tr. 173).  Although Dr. Franyutti found Claimant "credible," her

willingness to assign Claimant an RFC of light work evidenced her belief Claimant's allegations

of pain were not entirely credible.  Finally, Dr. Bailes, a neurologist,  examined Claimant in

April 2005 and wrote, "his neurological examination today is nonfocal.  He has tenderness in his

low back, diminished motion, but not erythema or swelling."  Dr. Bailes noted Claimant

continued to experience pain, despite chiropractic and conservative management.  (Tr. 245).

    Contrary to Claimant's assertions, the ALJ properly evaluated Dr. Davenport's and

Chiropractor Kritzer's reports.  **Dr. Davenport**: Dr. Davenport examined Claimant in March

2006 and concluded Claimant was "totally disabled" and could not return to work for one year.

(Tr. 285, 290).  The ALJ discredited Dr. Davenport's opinion because it was contradicted by

other medical evidence in the record and because Dr. Davenport did not "provide any objective

medical evidence to support his opinion."  (Tr. 18).  The Court finds the ALJ's conclusion is

supported by substantial evidence, namely the reports from Dr. Franyutti, Meyer, Bailes, and Mr.

Cooks.  See 20 C.F.R. §§ 404.1527(d), 416.927(d).  In so finding, the Court is mindful its role is

not to re-weigh the evidence, but to determine whether substantial evidence supports the ALJ's

conclusions.  See Hays, 907 F.2d at 1456.  **Chiropractor Kritzer**: Mr. Kritzer treated Claimant

from December 2000 through April 2005.  (Tr. 18).  In a letter dated August 2004, Mr. Kritzer

concluded Claimant was "temporarily totally disabled pending results of an updated MRI."  (Tr.

191).  In December 2006, Mr. Kritzer indicated he instructed Claimant not to work till further

notice.  (Tr. 239).  The ALJ discredited Mr. Kritzer's opinion, stating "since Mr. Kritzer is not an

appropriate medical treatment source by Social Security Administration, his disability opinion is

given little weight."  (Tr. 18).  Bearing in mind - as it did above - it is not the Court's role to re-

weigh the evidence, the Court finds the language of sections 404.1513(a) and 416.913(a) of Title

20 of the Code of Federal Regulations provides the necessary support for the ALJ's decision.

Third, as noted by the ALJ, Claimant retained the ability to return to work after

sustaining his injury.  The record establishes Claimant injured his back in October 2000 while

dragging a 500-pound piece of equipment at work.  (Tr. 110).  He stopped working in December

2000 when, as Claimant explains, the pain became unbearable.  (Tr. 111).  In April and May of

2003, Claimant worked for six weeks for Pre-Sort Plus.  (Tr. 74).  While Claimant had two full-

time "helpers" to perform the installation of equipment, and was merely hired for his "intelligence," Claimant's demonstrated ability to function outside the home and give instructions to his "helpers" contradicts the degree of pain alleged.

### IV.  Recommendation

For the foregoing reasons, I recommend that:

1.       Claimant's Motion for Summary Judgment be **<u>DENIED</u>** because the ALJ complied with the two-step process set forth in <u>Craig</u> for evaluating the credibility of Claimant's allegations of pain, and because substantial evidence supports the ALJ's conclusion Claimant's allegations of pain were not entirely credible.

2.        Commissioner's Motion for Summary Judgment be **<u>GRANTED</u>** for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.


DATED: April 9, 2008.

                                        /s/ James E. Seibert    
                                        JAMES E. SEIBERT
                                        UNITED STATES MAGISTRATE JUDGE